# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

_____

| | |
|---|---|
| **JANICE MOLETTE, ET AL.** | **CIVIL ACTION NO. 04-0501-A** |
| **-vs-** | **JUDGE DRELL** |
| **THE CITY OF ALEXANDRIA, ET AL.** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

Before the Court is a Motion for Summary Judgment filed on December 28, 2006, by Defendants:  Sergeant Bruce Fairbanks, individually and as an employee of the City of Alexandria; former Chief of Police Tommy Cicardo, individually and as an employee of the City of Alexandria; and Officer Chris Wolf, individually and as an employee of the City of Alexandria.[1]  (Doc. # 72).  Plaintiff, Janice Molette, does not oppose the motion.[2]  The Court finds there is no need for oral argument in this matter.  For the reasons set forth herein, Defendants' Motion for Summary Judgment will be GRANTED.

_____

[1] The City of Alexandria has been previously dismissed from this suit.  (Doc. # 51).

[2] Under Local Rule 7.5W of the Uniform District Court Rules, a respondent who chooses to oppose a motion has 15 days after service of the motion to file a response.  Here, Plaintiff elected not to file a response in opposition to the instant motion.  Although Plaintiff's Counsel, Hersy Jones, Jr., was recently disbarred (See In re Jones, 952 So. 2d 673 (La. 2007)), Plaintiff was properly represented at all times relevant to this case, including the time periods coinciding with this motion.

Following this Court's September 30, 2005, ruling on Defendants' Motion to Dismiss (Doc. # 51), only the following claims remain in this suit:   (1) Ms. Molette's unreasonable search and seizure claims under the Fourth Amendment and the Louisiana Constitution; and (2) Ms. Molette's state law claims for negligence, assault and battery, and excessive force.   Ms. Molette's right to bring these claims, *i.e.*, her standing, emanates under Louisiana's wrongful death and survival action statutes, articles 2315.1 and 2315.2 of the Louisiana Civil Code.   Under these articles, the right of action accrues to the persons listed within the legislatively designated highest ranking category, to the exclusion of all others.   As discussed in our earlier ruling (Doc. # 51), in this instance, these rights of action accrued to Anthony Molette's mother, Janice Molette.[3]

## **BACKGROUND**

_____In the early morning hours of February 19, 2003, the 911 Communications Center in Alexandria, Louisiana received a telephone call from a black male who identified himself as Dwayne Porter. The caller reported that he had been robbed and beaten by Anthony Molette.   In response to this call, Alexandria Police Department ("APD") Officer Michael Fuller was dispatched to the location of the reported robbery, 2847 Lee Street, Alexandria, LA.  Shortly after arriving at the Lee Street location, Officer Fuller's marked patrol car was fired upon and struck

---

[3] A thorough discussion of this case's procedural history can be found in Defendants' Motion to Dismiss.  (Doc. # 51).

repeatedly (approximately 15-16 times) by rifle caliber bullets.  (Doc. # 72, exhibit A).

APD Detective Daryl Thiels was assigned to investigate the shooting. Thiels first investigated whether Anthony Molette was involved in the events. After discovering that an arrest warrant had already been issued for Mr. Molette for violating the terms of his probation, Thiels, together with the APD's Special Response Team ("SRT"), assisted agents for the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, in a search of Molette's last known address.  Mr. Molette was not located during that search.

Later that evening, APD Sergeant Bruce Fairbanks conducted a tape recorded interview with a confidential informant ("CI") who claimed that Anthony Molette was responsible for shooting Officer Fuller's vehicle.  During that interview, the CI reported, among other things:  that he had seen Anthony Molette earlier in the evening at two locations (2316 and 2316 ½ Wise Street in Alexandria); that Molette was armed with an AK-47 assault rifle and two handguns; that two other people, Cherry Atkins and Carolyn Davis, had also been present with Mr. Molette at those locations; and that Molette had said "court would be held in the street," and that he wished he had "killed that bitch," when referring to Officer Fuller.   (Doc. # 72, exhibits A and B).

Based on the information gathered during his investigation, Detective Thiels prepared search warrant applications for the houses located at 2316 and

2316 ½ Wise Street.[4]  Thiels' presented the warrant applications to State District Court Judge Tom Yeager, who signed search warrants for both properties.[5]  (Doc. # 72, exhibit A3).

Shortly thereafter, a plan to search the Wise Street houses was drawn up by SRT leaders, Corporal Van Dyke and Corporal Cooper.  Also present at the meeting where the plan was devised were APD Officers Fairbanks, Slaughter, Van Dyke, Carruth, Ezernack, Green, Sheehy, Cooper, Wolf, Bradley, King, Simms, Edwards, and Lummus.  (Doc. # 72, exhibit B).  The plan called for dynamic entry, *i.e.*, simultaneous entry, into 2316 Wise Street and 2316 ½ Wise Street (the "white house" and the "pink house" respectively).

The "white house" entry team consisted of Corporal Van Dyke, the team leader, and Officers Carruth, Ezernack, Green, and Sheehy.  The "pink house" entry team consisted of, among others, team leader Corporal Cooper, and Officer William Wolf.[6]

---

[4] At the same time the search warrants were being prepared, APD Detective Darrel Bradley surveilled two black females walking from 2316 Wise Street.  The two females were stopped and detained for questioning.  Both women denied seeing Mr. Molette in the houses or on the property at either 2316 or 2316 ½ Wise Street.  (Doc. # 72, exhibit A3).  One of the women questioned was later identified as Carolyn Davis.

[5] Although the warrant applications themselves requested a "no-knock" entry into the two houses, neither warrant actually contained such a provision.  (Doc. # 72, exhibit B).

[6] The record evidence does not contain the names of the remaining members of the "pink house" entry team.

(Doc. # 72, exhibit C).  The entry plan was approved by Chief Cicardo, and Detective Fairbanks was assigned to oversee the implementation of the plan and the entry teams' deployment.

Unfortunately, execution of the plan did not go as desired.  Dynamic entry into the houses did not occur because the "white house" entry team was unable to breach that residence's front door.  The parties disagree as to exactly what transpired next.

Wilbert Lee Anderson, a bystander who claims to have witnessed the incident, testified that immediately following the SRT's attempted entry into the white house, he heard gunshots and saw two officers, later identified as Officers Carruth and Ezernack, fall to the porch.  (Doc. # 72, exhibit D).  A gunfire exchange then ensued, and approximately "ten to twelve minutes later," Mr. Molette exited the white house in a "jogging like" manner holding what appeared to be an AK-47 in his right hand and a pistol in his left, with both guns' barrels pointed "straight up" in the air.  (Doc. # 72, exhibit D).  According to Anderson, Molette continued jogging slowly toward a "white nova" parked on the street, when the police officers "gun[ned] him down."  (Doc. # 72, exhibit D).[7]

_____

[7] When questioned as to whether  Molette said anything during his exit from the white house, Anderson responded as follows:

> I heard the officers telling him [Molette] to.  I heard the officers saying something. I couldn't hear exactly what he [Molette] was saying but I heard the officers because they had several voices coming from the officers.  You had one officer saying get down . . . by the time Anthony made it off the porch of that other house [the white house], that's when the officer holler[ed] get down.

(Doc. # 72, exhibit D).

5

Officer Wolf describes the events differently.  According to Wolf, who was a member of the "pink house" entry team, shortly after Officers Caruth and Ezernack were shot, he saw the rifle held by Molette come out of a side window of the white house, and fire five or six times toward an officer positioned on the ground outside of the residence.  (Doc. # 72, exhibit C).  Mr. Molette then ran out of the house, continuing to fire his rifle at the SRT, at which point, Officer Wolf shot him several times.[8]  (Doc. # 72, exhibit C).

## LAW AND ANALYSIS

### SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure mandates that a summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file . . . together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986). If the movant produces evidence tending to show there is no genuine issue of material fact, the nonmovant must then direct the Court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material

---

[8] While the record indicates that Mr. Molette was shot and killed shortly after exiting from the white house, the evidence is unclear as to who delivered the fatal shot, or whether any members of the SRT, other than Officer Wolf, shot Molette.

fact for trial.  Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 321-23, 106 S. Ct. 2548, 2551-53 (1986)).  In the analysis, all inferences are drawn in the light most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989).  However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment.  Brock v. Chevron U.S.A., Inc., 976 F.2d 969, 970 (5th Cir. 1992).

**FEDERAL CLAIMS**

42 U.S.C. § 1983 allows claimants to seek redress against any person who, under color of state law, deprives him or her of a constitutionally guaranteed right.  See 42 U.S.C. 1983 (2006).  Claims brought under this statute are analyzed according to whether the defendant is an individual or a governmental entity.  See Monell v. Dep't of Social Servs., 436 U.S. 658, 691-92, 98 S.Ct. 2018, 2036 (1978). Here, Plaintiff sued Chief Circardo, Sergeant Fairbanks, and Officer Wolf (collectively "the APD Defendants") under § 1983 both individually and in their official capacities.

**Official Capacity Claims**

Plaintiff  alleges that the APD Defendants, in their official capacities, violated Mr. Molette's constitutional rights under the Fourth Amendment.  (Doc. # 100).  A suit against local government officials in their official capacities is in essence a suit against the governmental entity itself.  See Woodrus v. Andrus, 419 F.3d 348, 352 (5th Cir. 2005).  A local governmental entity cannot be held

vicariously liable for the constitutional torts of its employees or agents, "unless there is a showing of a policy or practice approved by the entity." Daniel v. Compass, 2006 WL 3627141*2 (5th Cir. Dec. 13, 2006); see also Monell, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").[9]  Thus, to establish liability for a constitutional violation against the APD Defendants in their official capacities, Plaintiff must demonstrate that the alleged constitutional offense is the policy or custom of the APD. See Woodrus, 419 F.3d at 352.    A careful review of the record shows that Plaintiff does not specifically identify an ordinance, regulation, policy, or a well-settled custom or policy of the APD which is violative of the Fourth Amendment.  Without such a showing, Plaintiff can prove no set of facts to support her § 1983 claims against the APD Defendants in their official capacities.  As such, these claims will be dismissed with prejudice.

---

[9] While official policy is contained  typically in duly promulgated policy statements, ordinances or regulations, a policy may be evidenced by a custom, that is "a persistent, widespread practice of [local governmental] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [local governmental] policy." See Webster v. City of Houston, 735 F.3d 838, 841 (5th Cir. 1984).  Actions of officers or employees of a municipality do not render the [governmental entity] liable under section 1983 unless they execute official policy as above defined. See Id.

**Individual Capacity Claims**

**1.   "No Knock" Entry**

Plaintiff alleges that the individual actions of Chief Cicardo, Sergeant Fairbanks, and Officer Wolf violated Mr. Molette's Fourth Amendment rights to be free from unreasonable searches and seizures.   The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  In this case, the APD Defendants possessed valid search and arrest warrants.  The issue at bar is whether the APD Defendants' suspicions were reasonable to justify entry into the Wise Street houses without announcing their presence.

The Fourth Amendment's protection "incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."  Richards v. Wisconsin, 520 U.S. 385, 387, 117 S.Ct. 1416, 1417 (1997).  This requirement is flexible and "should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests."  Wilson v. Arkansas, 514 U.S. 927, 934, 117 S.Ct. 1416, 1423 (1995).   "Courts must determine whether an unannounced entry is reasonable under the particular circumstances of the case and in light of the law enforcement's actions as a whole."  United States v. Cantu, 230 F.3d 148, 152 (5th Cir. 2000).  The showing of reasonableness necessary to overcome the "knock and announce" requirement "is not high."  United States v.

9

Washington, 340 F.3d 222, 226 (5th Cir. 2003) (quoting Richards, 520 U.S. at 394). In order to justify a "no knock" entry, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous and futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  Richards, 520 U.S. at 394.

With these principles in mind, it is clear that the SRT's unannounced entry into the Wise Street houses was not unreasonable under the Fourth Amendment. At the time of the attempted entry, the SRT reasonably believed that knocking and announcing their presence would be dangerous.  As mentioned, Mr. Molette was:  suspected in the attempted murder of Officer Fuller; wanted on a valid arrest warrant for violating the terms of his probation; reportedly seen at the Wise Street locations; and believed to be armed with an AK-47 and two pistols.  Under these circumstances and in light of the law enforcement's actions as a whole, we find that the SRT's unannounced entry into the Wise Street houses did not violate Mr. Molette's Fourth Amendment rights.  Accordingly, Plaintiff's unreasonable search and seizure claims under the Fourth Amendment will be dismissed with prejudice.[10]

---

[10] Louisiana law is nearly identical to federal law with respect to unreasonable search and seizure claims.  Therefore, for the same reasons as discussed above, Plaintiff's unreasonable search and seizure claims under the Louisiana Constitution will be dismissed with prejudice.

## 2.  Excessive Force

In response to Plaintiff's Fourth Amendment claim of excessive force, Officer Wolf asserts that he is entitled to qualified immunity.[11]  (Doc. # 72).  "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of the then clearly established law."  Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001).  A two-part test is used in determining whether a law enforcement official is entitled to qualified immunity:  (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the official's conduct was objectively reasonable in light of the clearly established law at the time of the incident.  See Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1988).

"In terms of the law being clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).  As for the second prong of the test, "the touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law."  Id.  "Therefore, even law enforcement officials who

---

[11] Because Plaintiff has failed to adduce any evidence which would tend to show that either Chief Cicardo or Officer Fairbanks used excessive force against Mr. Molette, all excessive force claims against these defendants will be dismissed.  We therefore restrict our qualified immunity analysis to Officer Wolf.

reasonably but mistakenly commit a constitutional violation are entitled to immunity." Id.  It is the plaintiff's burden to prove that a governmental official is not entitled to qualified immunity.  See Michalik v. Hermann, 422 F.3d 252, 258 (5th Cir. 2005).

Under the first prong of the qualified immunity test, a plaintiff must allege a violation of a clearly established constitutional right.  In the present case, Plaintiff alleges that Officer Wolf violated Mr. Molette's rights under the Fourth Amendment by using excessive force.  (Doc. # 1).

To sustain an excessive force claim, a plaintiff must demonstrate (1) an injury (2) resulting directly and only from the use of force that was excessive to the need and (3) that the force used was objectively unreasonable.  Flores v. City of Palacios, 381 F. 3d 391, 396 (5th Cir. 1996).  It is clearly established in this Circuit that "the use of deadly force is objectively unreasonable unless the officer has probable cause to believe that the  suspect poses a significant threat of death or serious physical injury to the officer or others."  Id; see also Ballard v. Burton, 444 F.3d 391, 402 (5th Cir. 2006).  Here, Plaintiff argues that Officer Wolf's ostensible use of deadly force was objectively unreasonable because Mr. Molette no longer posed a significant threat of death or serious physical injury to the officers.  Thus, Plaintiff has satisfied the first prong of the qualified immunity analysis.

Turning to the second prong of the analysis, we must now consider whether Officer Wolf's actions were objectively reasonable under the law existing

at the time.   The record reflects that Officer Wolf shot Mr. Molette several times during the course of his attempted flight from law enforcement officers.   Wolf claims that the force he used was necessary under the particular circumstances because "[Molette] was shooting at [him] and at the other officers."   (Doc. # 72, exhibit C).  Plaintiff, on the other hand,  contends that the use of deadly force was excessive.   To "gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need of the force."   Flores, 381 F.3d at 399.  Such a balancing test "requires careful attention to the facts and circumstances of each particular case."   Id.

As discussed above, at the summary judgment level, the record evidence must be viewed in the light most favorable to the plaintiff.  In this instance, that standard requires us to accept Willie Anderson's version of the facts as true. According to Mr. Anderson's testimony, an exchange of gunfire ensued between the police and Molette  immediately following the SRT's unsuccessful attempt to gain entry into the white house.  Approximately 10-12 minutes later,  Mr. Molette exited the house in a "jogging like" manner with his hands up in the air, holding what appeared to be an AK-47 in his right hand and a pistol in his left, when the officers "gun[ned] him down."  (Doc. # 72, exhibit D).[12]

_____

[12] In addition to the above testimony, Mr. Anderson testified that, after Molette was initially shot, "somewhere between six, [and] seven officers" surrounded Molette and shot him repeatedly while he laid on the ground.  Even taken as true, there is no evidence that such force was excessive under the particular circumstances.  That is, even assuming that members of the SRT repeatedly shot Molette while he laid on the ground, the record is devoid of summary judgment evidence (such as ballistic reports, officers' testimony, or medical reports) to support a finding that Mr. Molette no longer posed a significant threat of death or serious physical injury to

Viewing these facts in the light most favorable to Plaintiff, we find that Officer Wolf's conduct was objectively reasonable in light of the then clearly established law.  From the time that the SRT attempted entry into the white house, to the time that deadly force was employed, Mr. Molette never verbally conveyed, or attempted to convey, his intention to surrender to the law enforcement officials.  When Molette exited the white house, he was still armed with the same rifle caliber weapon that he used just minutes earlier to shoot several SRT officers.  Moreover, Molette failed to heed at least one SRT member's request to "get down." (Doc. # 72, exhibit D). Given these facts and circumstances, Officer Wolf had probable cause to believe that Molette still posed a significant threat of death or serious physical injury to the SRT.  As such, Officer Wolf is entitled to qualified immunity.

### 3.   Supervisory Liability

Plaintiff also alleges that Chief Cicardo and Sergeant Fairbanks are liable as supervisors of Officer Wolf.[13]  To sustain such a claim, Plaintiff may not rely on a theory of vicarious or *respondeat superior* liability, but must show that the conduct of the supervisors denied Mr. Molette his constitutional rights.  To meet this burden, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the

---

the officers.  Without more, this testimony is immaterial to our determination of whether *Officer Wolf's* actions on the day in question were violative of the Fourth Amendment.

[13] We address Plaintiff's supervisory liability claims, despite our finding that Officer Wolf's conduct did not violate Molette's constitutional rights.

failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." <u>See Estate of Davis ex rel. v. City of North Richland Hills</u>, 406 F.3d 375, 381(5th Cir. 2005).

Here, there is no record evidence that either Cicardo or Fairbanks failed to train or supervise Officer Wolf or any member of the SRT sent to the Wise Street locations on the day in question. On the contrary, the record reveals that Officer Wolf and Sergeant Fairbanks received extensive training during the course of their employment with the APD. (Doc. # 72, exhibits E & F). Furthermore, the evidence shows that, on the day in question, Sergeant Fairbanks both supervised and actively participated with the SRT in executing the Wise Street search warrants. (Doc. # 72, exhibit B). There is no material issue on the record before us with regard to the question of whether Cicardo and/or Fairbanks failed to train or supervise Officer Wolf.[14] Accordingly, Plaintiff's supervisory liability claims against Cicardo and Wolf will be dismissed with prejudice.

**STATE LAW CLAIMS**

Plaintiff also claims that the APD Defendants violated Louisiana law under several legal theories, including negligence, assault and battery, and excessive force. (Doc. # 1). However, in light of our above finding of reasonableness with regard to Officer Wolf's actions, and because Plaintiff has failed to adduce summary judgment evidence sufficient to sustain a claim against Chief Cicardo

---

[14] Because Plaintiff has failed to meet the first requirement toward establishing a claim of supervisor liability, we need not address the two remaining elements.

15

and/or Sergeant Fairbanks, Plaintiff's remaining state law claims will be dismissed with prejudice.

**CONCLUSION**

In summary, all of Plaintiff's claims will be dismissed with prejudice.

SIGNED on this 25th day of July, 2007, at Alexandria, Louisiana.

Dee D. Drell
United States District Judge
